Filed 2/20/15  P. v. Schreiber CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>HOWARD SCHREIBER,<br><br>        Defendant and Appellant. | H039565<br>(Santa Clara County<br> Super. Ct. No. CC946410) |

Defendant Howard Schreiber appeals from a judgment of conviction entered after a jury found him guilty of three counts of intimidating a witness with threats of force (Pen. Code, § 136.1, subd. (c)(1) – counts 1, 4, 7), three counts of threatening force and violence against a witness (Pen. Code, § 140, subd. (a) – counts 2, 5, 8), and three counts of making criminal threats (Pen. Code, § 422 – counts 3, 6, 9).  The jury also found true the allegations that in counts 1, 4, and 7, defendant maliciously used "force or threatened, either directly or indirectly, to use force or violence on the person or property of a witness . . . ."  Defendant admitted the truth of the allegations that he had suffered one prior strike conviction (Pen. Code, §§ 667, subds. (b)-(i), 1170.12), one prior serious felony conviction (Pen. Code, § 667, subd. (a)), and one prior prison term (Pen. Code, § 667.5, subd. (b)).  The trial court sentenced defendant to state prison for 17 years.  On

appeal, defendant contends there was insufficient evidence to support his convictions. We affirm.

## I. Statement of Facts
### A. Prosecution Case
### 1. Background

Alan Steinmark was employed as a senior enforcement technical officer with the United States Department of Homeland Security in the Immigration and Customs Enforcement (ICE) unit. He resided in Hicksville, New York. Sometime in June 2002, he discovered that someone had broken into his government vehicle, which was parked outside his residence. The burglar took various items, including a Gold's gym bag, two empty magazines for his .9 millimeter firearm, bullet-proof vests, a pair of handcuffs, a can of Red Bull, and a portable radio. Steinmark reported the incident. In 2005 or 2006, he received a call from Assistant District Attorney Higgins from Nassau County, Long Island. She informed him that defendant's DNA matched the evidence recovered from the government vehicle. She also told Steinmark that defendant had been arrested and was serving time in California for "a home invasion and a felony rape." After Steinmark testified in front of the grand jury in New York, defendant was indicted for the auto burglary.

### 2. Uncharged Conduct

Steinmark received a letter which was dated October 5, 2007. The letter was addressed to "Mrs. Bess Steinmark." Though no one in the Steinmark household was named "Bess," Steinmark read the letter and realized that it was from defendant. Steinmark's impression was that defendant was "upset" and that he wanted Steinmark to "try to do away with the complaint against him." Defendant stated, "Now to make issues easier, and not have any problems with the wrong person to you, FK up, Alan. You have two options put it in gear or I'll pay for your losses if that makes your wife happier.

2

[¶] . . . Last you have additional 60 days also." Steinmark interpreted these lines as "telling [him] to drop the charges, to call up the Nassau District Attorney and say forget about the broken window and the stolen government property." Defendant also stated, "[I]ts not a threat to your from or anyone else, that's the way I do business case is over 5 years for the F-ks from 911 attack cant worry about Schreiber Alan. 60 clear time or someone else will knock at your door and speak a word or two no threats. Okay, Mr. Steinmark, D.O.B. 3/7/49 Alan." Steinmark interpreted these lines as giving him "a time limit to change [his] story or someone's going to come knock at [his] door" and "a definite threat." Steinmark did not know whether defendant obtained his personal information from material in his stolen bag or whether he received it from his attorney, who had a copy of the police report which did not redact Steinmark's personal information. Steinmark was concerned and fearful, because defendant was in jail, mentioned Steinmark's wife, and indicated that he would pay a visit to his house. Steinmark's telephone number and date of birth were also included in the letter.

Defendant stated, "Also, if your wife can except my A.T.Y. or C.T.Y. call next week in afternoon. There we can discuss values over your loses by someone other than Schreiber, Bess." Steinmark believed that defendant intended to call his house and speak to his wife or him. At about midnight on October 15, 2007, Steinmark received a hang-up telephone call from a 408 area code. Steinmark investigated and linked the call to Evercom Systems, which was a private phone service for incarcerated inmates in San Jose, California. Steinmark then contacted the Nassau County District Attorney and the San Jose jail where defendant was incarcerated. Steinmark, his wife, and his in-laws, who resided with Steinmark, became fearful.

About three to five weeks later, Steinmark received a second letter, which was dated November 4, 2007, from San Jose, California. He realized that defendant was not "going to go away, and he was doing what he said he would do, contact us and threaten us again." The envelope was addressed to "Mrs. Steinmark" and the salutation on the

3

letter was "To Steinmark Family." Defendant again denied being involved in the auto burglary and being in the state of New York in 2002. Defendant asserted, "Like I stated to other case for telling for last time and letter to your family, don't make things any worser than a broken window. . . . [¶] Last your complaint in my way of freedom, asking you's nicely to remove my name from that crime, Alan no more to state go to D.A. Office and withdraw Shreiber's I.D." Steinmark interpreted these lines as indicating that defendant had learned that Steinmark had complained about the first letter and was threatening to make matters worse unless Steinmark had the charges dropped. Defendant also stated, "I should be expecting a few legal pieces of mail shortly stated you're cleared in complaint. Course, believe me, will be making visits to all complaintiffs soon just to be sure. So while your working, the bell should be ringing for answers. You got me guys." Steinmark interpreted these lines as indicating that defendant was coming to his house "to go" after his wife. Defendant ended the letter with the following: "Don't make me wait. Say by Nov 21, '07. I be looking for letter from wife." Steinmark's fears for his family and his safety increased. [1]

### 3. Counts 1, 2, and 3: April 2008 Letter

Steinmark received a third letter, which was dated April 30, 2008, and addressed to "Mrs. Steinmark." Defendant stated, "Informing your family of next part of the phoney movie, detectives and Alan filmed. Just like told yous a while ago, don't play games cause I will make things messy when case doesn't exist some three and a half years later." Steinmark perceived these lines as a threat to himself and his family. Defendant continued. "So what Schreiber is stating for your husband to wake up and see how real life is. Moving in west coast. You might want a truth in movie. Maybe need to watch 88 Minutes, the new one in theaters now. Then you'll see how life works, not three and a half years later." Steinmark recognized the reference to the movie in which

---

[1] The trial court instructed the jury that evidence of the letters, which were dated October 5, 2007 and November 4, 2007, were admitted only to show defendant's intent.

Al Pacino played a psychologist, who testified against a serial killer. The killer then threatened in letters to kill the Pacino character and there were people assisting the killer on the outside. Steinmark considered this reference a direct threat against him if he testified in the case. Defendant told "Betres" that he liked her, but did not like Steinmark because "he's a shaky guy it seems." He also stated, "I'm not threatening or harming your roof at any cost. Just because we looked you guy up on maps doesn't mean, Betres, we don't know the house cause, remember, you're accusing." Steinmark interpreted this passage as indicating that defendant knew where he lived and that he had told other people. Though Steinmark knew defendant was in custody, his use of "we" indicated that he was working with people who were not in custody. Defendant next asserted, "So like explained earlier, you should be off some street called Mills Avenue a straight mile or so, as you well know." Steinmark lived a mile from Miller Avenue. Defendant also stated, "So if your complaint holds me up, then we make hello visit to wify when she's available cause we don't need your presence and approval, Alan." This line increased Steinmark's fear and concern for the safety of his family, and he installed cameras around his house.[2] Defendant ended the letter, "Thanks for nothing lately. See you at the Hicksville Diner, Betres, shortly. Your favorite cake, pineapple cheesecake with scoop of vanilla ice cream. Okay, Betres? Enjoy." The Hicksville Diner is located two miles from the Steinmarks' house.

### 4. Counts 4, 5, and 6: May 2008 Letter

Steinman received a fourth letter, which was dated May 23, 2008. Though the return address in the previous letters had been from defendant, the return address on this letter listed "Erik Rosenblatt H.L.S., Homeland Security office in New York." Rosenblatt, a supervisory agent with Homeland Security, had been assigned to investigate Steinmark's case. Defendant stated, "You must be stupid Zion Jew cause you didn't

---

[2]     Steinmark had installed sensors after the auto burglary.

pursue it when it was at time of your wake-up day. Why are you waiting six years almost to prosecute it?" Steinmark is Jewish. Defendant continued, "It ain't past Miller Ave, make right turn, then left, R-turn, then L-turn then R-turn, first house or R-side, Gardenia Lane, Number 22. So as you see, we take care early, not six years later to be safer in life, Betres." These were the directions from the general area of the Hicksville Diner or the Long Island Railroad Train Station to Steinmark's home and increased Steinmark's concerns for his safety and that of his family. Defendant's reference to not waiting six years indicated to Steinmark "[t]he immediacy of the threat and they were going to do it soon."

Defendant continued, "Do you want to make your family and wife happy, Alan? Buy your wife Happy perfume, then get her cameras around the house with sensors around the house when anybody or anything can be recorded while sleeping or not at home. Then you don't wait three and a half years later. Ask your wife how is the pineapple cheesecake and ice cream at Hicksville Diner across road." It was particularly troubling to Steinmark that defendant knew about the sensors and cameras around his house. It indicated to him that defendant was working with someone, who was not in custody and was in New York, and that defendant was following through with his plan. Defendant also stated, "Some guy told one of my attorney's name Erik Rosenblatt from H.L.S. like your job may be criminal help. He was coming to San Jose, California, speak with me about the case from N.Y.S." "Alan, clear my name and numbers from problems. Not mine anymore." Steinmark interpreted these lines as instructing him to withdraw from the case or stop cooperating with the case. Defendant claimed that Steinmark "screwed up the entire investigation" of the auto burglary. He further stated, "So before you get sued and problems around your house please remove my reputation from complaint." He ended the letter, "See for cake and I.C.E. tea soon your house or Hick's Diner."

6

### 5. Counts 7, 8, and 9: June 2008 Letter

Steinmark received a fifth letter, which was dated June 2, 2008. The return address was "R.T.N., Esquire, 99 Hudson Street" with a New York zip code. Hudson Street is in a commercial area in lower Manhattan. Defendant again referred to his alibi. Defendant stated, "So to make issues short and simple like should've been, Newfeld's who began the case search won't finish. I guess will do things my way, Betres. You have 'til July 1, '08. If my name ain't off your complaint, start moving that FK R.T.N. quits." Steinmark noted that it was a definite threat and defendant gave him a specific date to comply. Defendant also asserted, "Don't FK with my life or you'll suffer like I've been and done. Husband not stupid, Mrs. Steinmark, I hope." "You won't hear from me. I washed my hands on yous. Up to you now or move or your sleeping is FK'd. Now we have all I.D.s on yous. Also make it your way." Steinmark was concerned that defendant said he and his cohorts had identified them and that he was going to hit them in the night. The last paragraph stated, "Mrs. Steinmark, move your husband out the house. You're okay to me. See you at Hick's Diner for cake and coffee." He ended the letter, "Bye, bye, Alan and Bess [¶] 7/1/08 final date."

When Steinmark asked a local ICE agent about defendant's criminal history, he was told that "there wasn't enough paper in the printer to print the report so it was turned over to another division that made a spreadsheet of his arrest record. And his criminal history was almost half an inch thick." Defendant's criminal history included "assaulting a police officer, paramedic, narcotic violations, burglary, assaults, marijuana possession and use." This information increased Steinmark's fear and it led him to believe that defendant was likely to follow through with his threats. After Steinmark received the June 2008 letter, his employer concluded that there was a threat against Steinmark's life that required employing "security 24 hours a day."

7

## 6. Investigation

Sergeant Nellie Davis was assigned to investigate the letters that were sent to Steinmark. Defendant, who was a Santa Clara County Department of Corrections inmate, had included his name, his personal file number, and the address of the Department of Corrections on the letters. Sergeant Davis obtained a handwriting exemplar from defendant. After Steinmark told Sergeant Davis that he had received a telephone call at his home that was linked to Evercom, she obtained jail records showing the number of "call attempts that were made from the jail to Mr. Steinmark's home." The first call attempt to Steinmark's telephone occurred on October 15, 2007. Jail records also showed that subsequent telephone calls were blocked by Steinmark.

Sergeant Benjamin Becchetti searched defendant's cell pursuant to a warrant in October 2007 and found numerous papers. Some of the documents contained the address and contact information for Steinmark.

Jeremiah Garrido, a criminalist for the Santa Clara County Crime Laboratory, testified as an expert in the area of DNA testing. Garrido extracted DNA from one of the envelopes, compared it to defendant's sample, and concluded that defendant was "included as a possible contributor to this DNA mixture." Garrido calculated that the mixture was "approximately 19.1 billion times more likely to have originated from [defendant] and an unknown individual than from two unknown individuals in the African American population, 41.3 billion times more likely to have originated from [defendant] and an unknown individual in the Caucasian population and . . . approximately 421 billion times more likely to have originated from [defendant] and an unknown individual than from two unknown individuals."

John Bourke, a criminalist, testified as an expert witness in handwriting analysis and comparison. He compared defendant's handwriting exemplars with the letters sent to Steinmark and concluded that defendant was the author of "most of" the letters.

8

## B. Defense Case

Defendant testified on his own behalf. Defendant was notified that he had been linked to an auto burglary. His retained counsel, Russell Newfeld, would not do what defendant wanted him to do. After Newfeld quit in mid-2007, he sent case documents from the auto burglary prosecution to defendant. These documents included Steinmark's date of birth, address, and social security number. Defendant admitted that he sent the October 2007 letter to Steinmark. The letter explained that defendant had an alibi for the auto burglary and he wanted the charges against him dropped. The letter did not contain any threats.

Defendant testified that he had not licked envelopes in 10 years, so his DNA could not have been on the envelopes sent to Steinmark.

When defendant did not hear from Steinmark, he sent a second letter. Defendant testified that he did not refer to violence or weapons in the letter, but he wanted Steinmark "to correct [his] name if he goes to the courts." Defendant also testified that he made one phone call to Steinmark, but he did not say anything.

Defendant wrote the April 2008 letter, which he wanted Steinmark to take to the police. Defendant did not believe the DNA evidence existed. When defendant referred to making "things messy" for Steinmark, he was indicating that he would "mess up [his] life" by causing him "aggravation" or he "might lose his job." Defendant conceded that this line would be "scary." He addressed the letter to Mrs. Steinmark because he wanted her to convince her husband to help clear his name. He did not know her name, so he called her "Betres or Bess, . . . a simple old lady's name in their of 80s." Defendant had never seen the movie *88 Minutes* and did not know the plot. The reference meant that "we could do this in 88 Minutes, process it and to find the person, not three and a half years later." When defendant mentioned that "we" looked up the address on maps, he was referring to the investigator that Newfeld had hired. The references to having cake

9

and coffee with Mrs. Steinmark was a "joke." He guessed that there was a Hicksville Diner.

Defendant wrote the May 2008 letter after he had not heard from Steinmark. Defendant provided Newfeld's name and telephone number so that Steinmark could contact him for more information. Defendant wrote the letters because he did not have an attorney. Defendant testified that he did not threaten Steinmark in this letter. Defendant learned at the preliminary hearing that Steinmark had put in sensors and cameras at his residence.[3] Defendant denied sending anyone to Steinmark's house and asserted that he was not trying to scare him. In this letter, defendant was trying to explain his alibi evidence and asserted that Steinmark "screwed up the entire investigation" by driving the burglarized car before the DNA evidence could be collected. Defendant wanted Steinmark to find the person who committed the auto burglary and remove his name from the complaint.

Defendant wrote the June 2008 letter and again explained the problems with his case. When he wrote, "You have until July 1, 2008, if my name ain't off your complaint start moving that FK R.T.N.," he was referring to the deadline for filing a complaint against Newfeld. When he stated that Steinmark would suffer like he had, he was referring to being subject to prosecution and serving a sentence for tampering with evidence. The portion of the letter about moving Steinmark out of the house was a phrase that he used to "annoy" Steinmark and was not a threat of violence.[4]

Defendant did not intend to keep Steinmark from testifying and he did not intend to threaten him or use force.

---

[3] The parties stipulated that there was no testimony during the preliminary hearing on January 14, 2008, "relating to cameras or sensors at the Steinmarks' house."

[4] Defendant also testified regarding a letter dated September 5, 2008, in which he made references to the television show "Seinfeld." He intended to harass Steinmark into action. Defendant was not charged in connection with this letter. Defendant stopped writing to Steinmark after he was served with a no contact order.

Defendant was convicted of robbery and first degree burglary in 2006. He was convicted of burglary in 2009.

## II. Discussion

Defendant contends that there was insufficient evidence to support his convictions of criminal threats in the letters sent in April 2008 (count 3), May 2008 (count 6), and June 2008 (count 9).

"The law we apply in assessing a claim of sufficiency of the evidence is well established: ' " ' " '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " ' [Citation.] The standard is the same under the state and federal due process clauses. [Citation.] 'We presume " ' in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved." [Citation.]' [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)

In order to prove a violation of Penal Code section 422, the prosecution must establish: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or

11

her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)[5]

Defendant argues that he made no threats to commit a crime against Steinmark or his family that would result in death or great bodily injury in any of the three letters.

"[A] criminal threat 'is a specific and narrow class of communication,' and 'the expression of an intent to inflict serious evil upon another person. [Citation.]' [Citation.] [¶] 'A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does "not communicate a time or precise manner of execution, section 422 does not require those details to be expressed." [Citation.]' [Citation.]" (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805-806.) "'It is clear that the nature of the threat cannot be determined only at face value. Section 422 demands that the purported threat be examined "on its face and under the circumstances in which it was made." The surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat,' and such threats must be 'judged in their context.' [Citations.]" (*Id.* at p. 807.)

Here, defendant, who had been incarcerated for various felony offenses, sent two letters to Steinmark approximately six months prior to sending the April 2008 letter. In these letters, defendant demonstrated that he knew Steinmark's personal information,

---

5       Penal Code 422 section provides in relevant part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."

12

including his address and telephone number, and he wanted the case against him dropped. Defendant stated that someone would go to Steinmark's house while he was working, he intended to call Steinmark's wife, and he knew Steinmark had complained about defendant's first letter. Defendant also told Steinmark not to "make things worse than a broken window." Shortly after the first letter, defendant attempted to call Steinmark.

Within this context, defendant sent the April 2008 letter (count 3). Defendant told Steinmark that he would "make things messy" and mentioned a diner which was two miles from Steinmark's house. Defendant referred to "we" when indicating knowledge of the location of Steinmark's house and an intent to "visit" Steinmark's wife. Defendant also stated: "So what Schreiber is stating for your husband to wake up and see how real life is." "You might want a truth in movie. Maybe need to watch 88 Minutes, the new one in theaters now. Then you'll see how life works, not three and a half years later." *88 Minutes* was a movie in which a serial killer threatened in letters to kill an individual who had testified against him. The serial killer was also assisted by individuals who were not incarcerated. Thus, when considered in the context of the prior letters, the reference to the movie and the use of "we" was an indirect threat to kill Steinmark.

In connection with the April 2008 letter (count 3), defendant argues that his statements were "unintelligible ramblings complaining about the fact that it took three and a half years to charge him with the offense and explaining that he could not have committed the offense because he was not in the state of New York at the time." Though the letter was somewhat disorganized, it was not unintelligible. While portions of the letter expressed his anger about the charges and claimed that he had an alibi, he also directed threats to Steinmark and his wife.

Defendant next notes that he specifically wrote in the April 2008 letter, "I'm not threatening or harming your roof at any cost," after he mentioned looking up Steinmark's address on maps. However, other statements in the letter did not support this claim, and the jury could have reasonably concluded that defendant did intend to threaten Steinmark.

13

Defendant also argues that the reference in the April 2008 letter to "'88 Minutes,' when read in context, was a reference to time and the fact that Steinmark's crime took three and a half years to solve as opposed to 88 minutes like in the movie." Given that defendant repeatedly indicated that others were assisting him and he demanded over and over that Steinmark prevent the case from being prosecuted, the jury could have reasonably interpreted the reference to the plot of the movie, and not to the passage of time.

We next consider the May 2008 letter (count 6). After providing detailed directions from the Hicksville Diner or the Long Island Railroad Train Station to Steinmark's home, defendant claimed, "So as you see, we take care early, not six years later to be safer in life, Betres." In addition to mentioning the sensors and cameras around Steinmark's home, defendant told Steinmark to drop the case against him before there were "problems around [his] house." Though the letter did not contain any direct threats, given the previous letters, defendant was indirectly threatening that he was following through with his plan with the assistance of others to commit a crime against Steinmark or his family that would result in death or great bodily injury.

In connection with the May 2008 letter, defendant argues that he only threatened to sue Steinmark for false allegations. Though defendant referred to suing Steinmark, he also threatened that there would be "problems around [his] house" if Steinmark did not comply with his demands. Defendant next argues that there was no indication that anyone actually visited the Steinmark home. However, defendant referred to the sensors and cameras around the Steinmark home, thus indicating that someone had been to the home.

In the June 2008 letter (count 9), defendant stated that he would "do things [his] way" and gave a deadline of July 1, 2008, to comply with his demands. He also stated, "Don't FK with my life or you'll suffer like I've been and done." He continued, "You won't hear from me. I washed my hands on yous. Up to you now or move or your

14

sleeping is FK'd.  Now we have all I.D.s on yous."  When read in context of the previous letters, defendant's threat of suffering and that their "sleeping [would be] FK'd," constituted a threat to commit a crime against Steinmark or his family that would result in death or great bodily injury.

Relying on *People v. Martinez* (1997) 53 Cal.App.4th 1212 (*Martinez*) and *People v. Mendoza* (1997) 59 Cal.App.4th 1333 (*Mendoza*), superseded by statute on other grounds as stated in *People v. Franz* (2001) 88 Cal.App.4th 1426, 1442, defendant contends that his statements were insufficient to support convictions of criminal threats in comparison to nonspecific statements in other cases.  In *Martinez*, the defendant yelled at the victim, " 'I'm going to get you,' " and " 'I'll get back to you, I'll get you.' "  (*Martinez*, at p. 1215.)  The following morning, the victim's place of employment was set on fire and the defendant was linked to the fire.  (*Id.* at p. 1216.)  *Martinez* concluded that the defendant's conduct provided meaning to the words that he used and thus there was sufficient evidence to support his conviction for criminal threats.  (*Id.* at pp. 1220-1221.)  In *Mendoza*, the victim, who had previously been associated with the defendant's gang, testified at the preliminary hearing of the defendant's brother.  (*Mendoza*, at p. 1337.)  Two days later, the defendant went to the victim's home and asked if she had read the newspaper.  (*Ibid.*)  The victim replied, " 'No, why?' "  (*Ibid.*)  The defendant told her that she had " 'fucked up his brother's testimony,' " and that " '[h]e was going to talk to some guys from' " his gang.  (*Ibid.*)  About 20 to 30 minutes later, the victim heard a car honking its horn and saw the defendant's friend in a car across the street.  (*Id.* at p. 1338.)  He honked the car again and looked at the victim.  (*Ibid.*)  *Mendoza* held that though the defendant's words "did not articulate a threat to commit a specific crime resulting in death or great bodily injury," the jury "could reasonably find that a threat to bring a person to the attention of a criminal street gang as someone who has 'ratted' on a fellow gang member presents a serious danger of death or great bodily injury," particularly since the defendant acted on his intention.  (*Id.* at pp. 1340, 1341.)  While there was evidence

15

of the conduct of the defendants in *Martinez* and *Mendoza* to provide a context for their nonspecific threats, we are not persuaded that such evidence is required to uphold the convictions in the present case. As previously discussed, the letters provided sufficient context in which to interpret defendant's threats.[6]

Defendant also argues that none of his statements were " 'unequivocal, unconditional, immediate and specific' threat[s] so as to convey a gravity of purpose and an immediate prospect of execution of the threat."

"[T]he determination whether a defendant intended his words to be taken as a threat, and whether the words were sufficiently unequivocal, unconditional, immediate and specific [as to convey] to the victim an immediacy of purpose and immediate prospect of execution of the threat can be based on all the surrounding circumstances and not just on the words alone." (*Mendoza*, *supra*, 59 Cal.App.4th at p. 1340.)

Here, defendant repeatedly referred to "we" in his letters, emphasized his knowledge of the location of Steinmark's home, portrayed himself as a victim, and set deadlines for Steinmark to act. Given these factors and Steinmark's knowledge of defendant's violent criminal history, the letters conveyed to Steinmark "an immediacy of purpose and immediate prospect of execution of the threat . . . based on all the surrounding circumstances." (*Mendoza*, *supra*, 59 Cal.App.4th at p. 1340.)

---

[6]     Defendant also cites several cases involving express threats, including *People v. Bolin* (1998) 18 Cal.4th 297, 336, fn. 11 [" 'If you ever[] touch my daughter again, I'll have you permanently removed from the face of this Earth. . . .  [¶] . . . [¶]  I told you a long time ago don't play fucking games with me.  You're playing with the wrong person asshole.  I've made a couple of phone calls to San Pedro to some friends of mine and the[y're] not to[o] happy with your fucking game playing with other people's money and especially you hitting Paula.  [¶] . . . [¶]  1 week asshole.' "] and *People v. Wilson* (2010) 186 Cal.App.4th 789, 798 [" 'I can find anybody and blast them.  That's what I do.  [¶] . . . I get out in the months.  I find people.  That's what I do, and I'm going to find you, and I'm going to blast you.' "].  (Italics omitted.)  However, there are no express threats in the present case.

16

Defendant next argues that Steinmark's fear was not reasonable under the circumstances, because he was incarcerated for the foreseeable future and there was no evidence that he was working with anyone to carry out a threat of great bodily injury or death on Steinmark or his family. We disagree. Though defendant was incarcerated, he referred to the sensors and cameras around the Steinmark home, which indicated that someone in New York had provided the information to him. Defendant also repeatedly referred to "we" in his letters. Thus, there was sufficient evidence to support a finding that Steinmark's fear was reasonable.

In sum, there was substantial evidence to support defendant's convictions for criminal threats.

Defendant also contends that since he made no threats of force or violence, there was insufficient evidence to support his convictions of intimidating a witness with threats of force (Pen. Code, § 136.1, subd. (c)(1) – counts 1, 4, 7) and of threatening force and violence against a witness (Pen. Code, § 140, subd. (a) – counts 2, 5, 8).

To prove that defendant violated Penal Code section 136.1, subdivision (c) the prosecutor was required to prove: (1) defendant maliciously prevented or discouraged or attempted to prevent or discourage Steinmark from cooperating or providing information so that a complaint, indictment, or information could be sought and prosecuted; (2) Steinmark was a witness or crime victim; (3) defendant knew he was preventing or discouraging, or trying to prevent or discourage Steinmark from providing information, so that a complaint, indictment, or information could be sought or prosecuted, or from attending and giving testimony at trial; (4) defendant acted maliciously; and (5) defendant used force or threatened, either directly or indirectly, to use force or violence on the person or property of a witness, a victim, or any other person. (*Mendoza*, *supra*, 59 Cal.App.4th at p. 1343; CALCRIM Nos. 2622, 2623.)

In order to prove defendant committed a violation of Penal Code section 140, the prosecutor was required to prove: (1) Steinmark gave assistance or information to a law

17

enforcement officer or public prosecutor in a criminal case; and (2) defendant willfully used force or threatened to use force or violence against Steinmark or threatened to take, damage, or destroy the property of Steinmark because he had given assistance or information. (CALCRIM No. 2624.)

Here, as previously discussed, there was substantial evidence that defendant made implicit threats to use force or violence on Steinmark.[7]

### III. Disposition

The judgment is affirmed.

_____
Mihara, J.

WE CONCUR:

_____
Elia, Acting P. J.

_____
Bamattre-Manoukian, J.

---

[7] Defendant has withdrawn his claim that the trial court improperly limited his goodtime/worktime credits to 15 percent.